**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 25-11527

Non-Argument Calendar

———————————————

YU WANG,

*Plaintiff-Appellant,*

*versus*

METROPOLITAN LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

———————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:24-cv-01124-SCJ

———————————————

Before ROSENBAUM, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

Yu Wang, proceeding *pro se*, appeals the district court's judgment in favor of Metropolitan Life Insurance Company ("MetLife") on his complaint under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* After careful review of the record and the parties' briefs, we affirm.

## I.

Wang was employed by General Electric ("GE") as an Engineering Technical Leader. As a salaried GE employee, Wang was covered by a benefits plan insured by Metlife ("Plan"), which provided long-term disability ("LTD") benefits in cases of "total disability."

The Plan states that MetLife will pay a monthly LTD benefit "as long as [participants] are absent due to Total Disability," among other requirements. The Plan defines "total disability" to mean that

> an employee is under the care of a physician or Psychologist, if necessary, for any treatment of his disability, and (A) because of illness or injury, is unable to engage in any gainful occupation for which he is reasonably fitted by education, training or experience; or (B) (i) is within the first 12 months of absence because of disability . . . and (ii) is unable, because of illness or injury, to perform any and every duty of his occupation held prior to his date of disability, lay off or leave of absence or to perform any occupation made available by the Company if medically appropriate.

To obtain benefits under the Plan, a claimant must submit "proof of claim." The Plan states that "[t]he Carrier will make all decisions on claims and has reserved the right to examine medically

an individual for whom claim is made at any time during the period of disability." And according to the Plan, "the management and control of the operation and administration of claim procedures under the Plan, including the review and payment or denial of claims and the provision of full and fair review of claim denial pursuant to [ERISA § 503], shall be vested in the Carrier." Since the Plan was insured, MetLife was designated as the "Carrier" under the Plan.

*A.*

Wang ceased working for GE near the end of October 2022, after experiencing frequent symptoms of shortness of breath, chest pain, and arrythmia. In August 2023, Wang applied for long-term disability benefits under the Plan, stating that he was unable to work because of a stress-related heart condition and chest pain and tightness.

A third-party administrator for the Plan, Sedgwick Claims Management Services, Inc., contacted Wang's treatment providers and requested additional medical records. Wang's primary care physician, Dr. Robert Donohue, completed a provider medical statement in August 2023, in which he opined that Wang had been incapacitated by chest pain, dyspnea, and palpitations since October 31, 2022, and could not return to work until August 11, 2024, citing Wang's diagnosis of "premature ventricular contractions" ("PVCs").

Wang's medical records show that he sought treatment for his symptoms from cardiologist Dr. Robert Joy in 2020 and then

again in 2022. In 2020, a "Holter monitor showed rare PVCs." Wang also had a "coronary CT scan showing a calcium score of 0 and a stress test that was normal." Then, in October 2022, Wang reported "increasing skipped heartbeat symptoms." Dr. Joy put Wang on a two-day Holter monitor, which showed "less than 1% PVCs." In December 2022, Dr. Joy performed an echocardiogram and exercise stress test, which were normal apart from "arrythmia" consisting of "rare PVCs." Dr. Joy noted that the PVCs "seem[ed] to be provoked by physical exertion such as hiking." Overall, Dr. Joy assessed that Wang had a "relatively benign condition," with no evidence of heart disease or risk of cardiac arrest.

In June 2023, Wang had an annual physical examination with Dr. Devender Reddy, a primary-care physician, after moving from New York to Georgia. Dr. Reddy's notes do not show any abnormal findings, apart from the fact that Wang scored at the low end of the moderate range on a depression-screening questionnaire.

Apart from these records, in December 2022, Dr. Donohue wrote a letter at Wang's request, and using language Wang supplied, stating that Wang had "experienced episodes of elevated stresses with panic attack like symptoms in the past 2 years," and that, as a result, Dr. Donohue had prescribed the use of an emotional support animal. Wang had requested the letter so he could bring his dog with him for holiday travel.

On September 7, 2023, Sedgwick issued a denial letter to Wang, stating that he did not meet the Plan's definition of "total

disability." The letter summarized Dr. Joy's testing and findings, noting that the echocardiogram and cardiac exercise stress-test findings were largely normal, and that Dr. Joy had assessed a relatively benign condition. The letter further noted that Dr. Reddy's physical findings were "within normal limits" and that no assessment or treatment plan was documented. Based on these records, the letter stated, "we are unable to consider you totally disabled as defined by the Plan as of 10/31/2022-present."

*B.*

The Plan allowed for up to two appeals of a denied claim. Wang submitted his first appeal in September 2023, claiming he had been told not to work by both Dr. Donohue and cardiologist Dr. Vineet Dua. Sedgwick forwarded the claim to MetLife for review.

Treatment records show that Dr. Dua diagnosed Wang with "[s]ymptomatic PVCs" and palpitations in September 2023. Dr. Dua told Wang to "hold off on work for now" given his reports that he was so symptomatic that he had to leave his job, and he referred Wang to Dr. Michael Riley, an electrophysiologist. Wang then saw Dr. Riley, who noted that the prior testing was largely normal except for rare PVCs. Dr. Riley found that the PVCs did not appear to be related to Wang's complaints of chest pain. Dr. Riley ordered a seven-day Holter monitor and a low-dose trial of diltiazem, and he directed Wang to follow up in four to six weeks.

In support of his appeal, Wang also submitted a letter from Dr. Dua dated October 3, 2023. In the letter, Dr. Dua wrote that

Wang could not work at that time because he was having symptomatic PVCs and chest pain. Dr. Dua stated that Wang should be excused for two weeks to evaluate diagnostic testing, but that his date of return was unknown.

MetLife referred Wang's claim to a third-party vendor for a cardiology peer review. To that end, Dr. Craig Napolitano, M.D., board certified in cardiology and internal medicine, reviewed Wang's medical records, spoke with both Dr. Donohue and Dr. Dua, wrote letters to each doctor summarizing their conversations, and then submitted a report to MetLife.

Dr. Napolitano's letter to Dr. Dua noted that Dr. Dua had agreed that Dr. Joy's testing "was consistent with symptoms not being due to PVCs and within normal limits," and that Wang's complaints were "common" to a cardiology practice and "usually most consistent with anxiety." The letter to Dr. Donohue noted that Dr. Donohue had agreed that Dr. Joy's assessment found that PVCs were a "benign condition," that Wang's complaints were common and "usually consistent with anxiety," and that he "was not aware of any new or other objective evidence that demonstrated the claimant was actually symptomatic from PVCs or another cardiac diagnosis." Both Dr. Donohue and Dr. Dua signed statements agreeing that the summaries were accurate.

Dr. Napolitano sent his conclusions to MetLife on October 11, 2023. Overall, he found that there was no evidence of any functional impairment from a cardiac diagnosis.

On October 26, 2023, MetLife sent Wang a letter denying his first appeal, citing Dr. Napolitano's conclusions. The letter was signed by Mike Hall, an appeals specialist for MetLife. On November 8, 2023, Hall e-mailed Wang, stating that his appeal would not be handled by Hall a second time, but by a "different person with a fresh set of eyes."

Wang submitted a second appeal in December 2023. He asserted that Dr. Napolitano's assessment was limited in scope, and that, among other problems, it failed to consider evidence of his panic disorder and depression or to address co-occurring conditions that affected his ability to work.

Hall reviewed Wang's second appeal and then sent an email to Jim Brault, a "Unit Leader" for MetLife's GE Disability Benefits Center. In the email, Hall wrote that Wang was "now claiming that his anxiety and depression are disabling in combination with his cardiac condition," but that he "did not provide any medical records for review and did not provide any contact info for a mental health provider," so MetLife could not document treatment for any alleged psychiatric condition. Hall advised that, in his view, the correct decision was to uphold denial of the claim, and he attached a proposed denial letter for Brault to review and sign. Brault responded that he agreed and that Hall could send out the letter.

On January 11, 2024, MetLife sent Wang a letter signed by Brault denying Wang's second appeal. The letter reviewed the grounds Wang raised, the medical records on file, and relevant provisions of the Plan. The letter reaffirmed the prior finding that

Wang's cardiac condition did not result in restrictions or limitations. As to Wang's "alleged anxiety and/or depression," the letter explained, "there is no available evidence documenting a severe psychiatric disorder." The letter noted that, while the medical records included references to anxiety, depression, and panic attack-like symptoms, there was no evidence of any psychiatric diagnoses, treatment by mental-health providers, or certification of disability or restrictions because of any psychiatric condition.

## II.

In March 2024, Wang filed a *pro se* complaint against Met-Life, alleging that he was entitled to LTD benefits under the Plan and requesting judicial review under ERISA. Discovery closed in October 2024. In November 2024, the parties filed a joint motion to extend the deadline to file dispositive motions until December 24, 2024, which the district court granted. On December 23, 2024, MetLife moved for judgment on the administrative record.

Wang responded in opposition, arguing that MetLife failed to review his conditions holistically, that it arbitrarily disregarded his mental-health claims, that the claims process was plagued by procedural deficiencies, and that MetLife's decisions were tainted by bias, conflicts of interest, and impartiality. Wang later moved for relief based on "deceptive settlement practices and procedural misconduct," stemming from problems with service of certain documents and MetLife's filing of the motion for summary judgment without notice during active settlement negotiations.

The district court denied Wang's motion for relief and granted MetLife's motion for summary judgment. As to Wang's motion, the court noted that, under its scheduling order, dispositive motions were due by December 24, 2024, "regardless of the status of settlement discussions," and that Wang was not prejudiced since he filed a timely response to MetLife's motion. The district court also noted that, while Wang disputed the completeness of the administrative record, he failed to object for several months after receiving the administrative record in July 2024, so his objection was untimely, and that his claims of omitted material were vague or unsupported.

Turning to the merits, the district court reasoned that MetLife's decision to deny Wang's claim for LTD benefits was not wrong, even under de novo review. The court also rejected Wang's arguments that conflicts of interest or a lack of impartiality tainted MetLife's decision. Wang timely appeals.

### III.

We review de novo the district court's grant of summary judgment in an ERISA case, applying the same legal standards that governed the district court's decision. *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1194 (11th Cir. 2010). *Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will be liberally construed. *Campbell v. Air Jam. Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014). But we may not "serve as *de facto* counsel for a party [or] rewrite an otherwise deficient pleading in order to sustain an action." *Id.* at 1168–69.

ERISA permits plan participants to sue for wrongful denial of benefits. *See* 29 U.S.C. § 1132(a)(1)(B). It does not provide a "standard for reviewing decisions of plan administrators," though. *Capone*, 592 F.3d at 1195. As a result, and based on Supreme Court guidance, we have established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions. *Blankenship v. Metropolitan Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011).

At the outset of its inquiry, the court should "[a]pply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision)." *Id.* at 1355. If the decision is not "*de novo* wrong," the court should "end the inquiry and affirm the decision." *Id.* But if the decision is "*de novo* wrong," the court should proceed with the next steps of the inquiry and determine whether the plan grants the administrator discretion in reviewing claims and, if so, whether the administrator operated under a conflict of interest. *Id.* Arbitrary and capricious review applies "where the plan grants the administrator discretion," *Capone*, 592 F.3d at 1195, and that review should account for any conflict and its severity, *Blankenship*, 644 F.3d at 1355. A conflict exists "where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Id.* But even so, the "basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision." *Id.*

Under "de novo review, the district court's charge is to put itself in the agency's place, to make anew the same judgment earlier made by the agency." *Harris v. Lincoln Nat'l Life Ins. Co.*, 42 F.4th 1292, 1296 (11th Cir. 2022) (quotation marks omitted, alteration adopted). The court may consider evidence not before the administrator when it denied benefits. *Id.* at 1295–97.

Under the arbitrary-and-capricious standard, a court must uphold the decision as "long as a reasonable basis for denying coverage exists . . . even if there is evidence that would support a contrary decision." *Johnson v. Reliance Standard Life Ins. Co.*, 159 F.4th 1304, 1312 (11th Cir. 2025). Judicial review under the arbitrary-and-capricious standard generally is limited to the administrative record at the time the decision was made. *Harris*, 42 F.4th at 1296.

## A.

We start with the appropriate standard of review. Wang argues that the district court erred by deferring to MetLife without assessing whether the Plan's language granted MetLife discretionary authority with sufficient clarity. MetLife responds that the Plan contains sufficient discretion-conferring authority to require review under the deferential arbitrary-and-capricious standard.

Here, we need not resolve whether the Plan expressly gave the insurer "discretionary authority to make eligibility determinations or to construe the plan's terms." *Johnson*, 159 F.4th at 1311–12 (quotation marks omitted); *see Moon v. Am. Home Assur. Co.*, 888 F.2d 86, 88-89 (11th Cir. 1989) (holding that discretionary authority must be "express," and cannot be "implied from the plan"). Even

assuming Wang is correct that the Plan did not expressly confer discretion—and we think he might be right about that[1]—the district court did not address the issue of deference and instead applied de novo review, so there is no need to remand for the court to apply that standard of review again.  We also agree with the court that MetLife's decision was not de novo wrong, for the reasons we explain in more detail below, making resort to the next steps in the multi-step analysis unnecessary.

*B.*

Next, Wang has moved to supplement the record on appeal with four new exhibits, which are as follows: (1) treatment notes from Dr. Reddy dated January 17, 2024, six days after the denial of his second appeal, stating that he had "[s]evere anxiety with panic" symptoms and prescribing Lexapro; (2) a report of an "educational consultation" with a nurse and psychiatric specialist dated March 5, 2025, which reviewed Wang's self-reported symptoms and the available treatments, but did not provide "diagnosis, treatment, or prescription"; (3) a "Notice of Disapproved Claim" from the Social Security Administration ("SSA") dated April 21, 2025, stating that

---

[1] Notably, the Ninth Circuit has held that nearly identical language "merely identified the plan administrator's tasks, but bestowed no power to interpret the plan," so it applied de novo review. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 964 (9th Cir. 2006) (citing *Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1113 (9th Cir. 2001)); *see also Kirwan v. Marriott Corp.*, 10 F.3d 784, 788-89 (11th Cir. 1994) ("Marriott may 'control and manage' the Plan, but it must do so in accordance with the terms of the Plan, and there is no grant of authority to construe these terms.").

Wang was "not disabled" under its rules; and (4) treatment notes from a physical with Dr. Reddy dated June 20, 2025, which noted that Wang's "anxiety is getting worse [and he is] also depressed," and that Wang would start on Wellbutrin and continue with Lexapro. Wang asserts that we may consider these post-denial records when applying de novo review.

When review is de novo in an ERISA case, the parties generally "can introduce evidence outside of the administrative record." *Harris*, 42 F.4th at 1297; *Shaw v. Conn. Gen. Life Ins.*, 353 F.3d 1276, 1284 n.6 (11th Cir. 2003) ("As a rule, *de novo* review permits the parties to put before the district court evidence beyond that which was presented to the administrator at the time the denial decision was made."). Thus, in *Harris*, we held that the district court erred by excluding the claimant's post-denial evidence, and we remanded for the court to consider that evidence. 42 F.4th at 1297-98. We declined to address whether the evidentiary error was harmless. *Id.*

But we noted in *Harris* that parties in ERISA cases were not "free to disregard a district court's scheduling order with respect to when the evidentiary record is deemed closed," stating that de novo review was "not an invitation for unending continuous review." *Id.* at 1297 n.4. And we "rarely enlarge the record on appeal to include material not before the district court which has labored without the benefit of the proffered material." *CSX Transp., Inc. v. City of Garden City*, 235 F.3d 1325, 1330 (11th Cir. 2000). Nonethe-

less, we "have the inherent equitable power to allow supplementation of the appellate record if it is in the interests of justice." *Id.* Supplementation may be in the interests of justice where "acceptance of the proffered material into the record would establish beyond any doubt the proper resolution of the pending issues." *Id.*

Here, we deny Wang's motion to supplement the record. He concedes that exhibits 2 through 4 were not submitted to the district court. And while Wang referenced exhibit 1 in proceedings before the district court, stating that Dr. Reddy had diagnosed anxiety and depression, he did not submit the treatment record for the court's review. Accordingly, he has not shown that the district court erred by failing to consider his post-denial evidence. *See Harris*, 42 F.4th at 1297–98 n.4.

Nor can we say that accepting the proffered material would establish beyond any doubt the proper resolution of the issues. *CSX Transp.*, 235 F.3d at 1330. The SSA determination was not favorable, so it does not even arguably help Wang, and the "educational consultation" expressly did not provide any "diagnosis, treatment, or prescription." Not only that, but the fact that Wang began receiving treatment for anxiety *after* MetLife's second denial decision in January 2024 says very little about his disability going back to October 31, 2022. Accordingly, we decline to permit supplementation of the record on appeal in this case.[2]

---

[2] In addition, Wang has attached an affidavit to his initial brief, without requesting supplementation, but "[w]e have not allowed supplementation when

25-11527                    Opinion of the Court                    15

*C.*

Turning to the substance of the matters in dispute, Wang argues that he met his burden of proof, and that MetLife's denial of his claim was de novo wrong. The district court disagreed, finding that Sedgwick's and MetLife's decisions were correct under the terms of the Plan. We agree with the district court.

It was Wang's burden to show that he met the definition of "total disability" under the plan. Even under de novo review, he did not do so. Wang's medical records fail to support his claim that he had a disabling heart condition. Although Dr. Donohue and Dr. Dua opined that Wang was not able to work for certain periods of time (from two weeks to two years) because of symptomatic PVCs, objective testing from Dr. Joy and Dr. Riley failed to show that Wang's PVCs were anything more than a "benign condition" that likely did not cause his symptoms of chest pain, tightness, and shortness of breath. Moreover, Dr. Donohue and Dr. Dua both later agreed with Dr. Napolitano, an independent cardiologist hired by MetLife, that Wang's symptoms were likely caused by anxiety, not by a cardiac condition. Thus, the record reflects that Wang was not totally disabled because of a cardiac condition and was not at increased risk for a cardiac event.

---

a party has failed to request leave of this court to supplement a record on appeal or has appended material to an appellate brief without filing a motion requesting supplementation." *Jones v. White*, 992 F.2d 1548, 1567 (11th Cir. 1993).

Wang also failed to show that he was receiving treatment for anxiety or depression, or that these conditions, alone or in combination with other impairments, made him unable "to perform any and every duty of his occupation." As MetLife acknowledged, the administrative record included a few stray references to anxiety, depression, and panic-attack-like symptoms. But it did not reflect any mental-health diagnosis, treatment by mental-health providers, or medical opinions about restrictions or limitations imposed by any mental-health condition.

For instance, while Dr. Donohue noted in a December 2022 letter that Wang had "experienced episodes of elevated stresses with panic attack like symptoms in the past 2 years," the record shows that this language was supplied by Wang, and no explanation or treatment notes from Dr. Donohue, who last saw Wang before the alleged period of disability, supported it. Plus, Dr. Dua and Dr. Riley were cardiologists who did not provide treatment for any mental-health condition. And Dr. Reddy simply noted possible depression, not anxiety, and did not make any diagnosis during the June 2023 visit. As the district court observed, "these references to anxiety and panic disorder are devoid of any related restrictions or limitations."

Wang's claim that MetLife applied vague or unstated standards in evaluating his claim is belied by the record. The record shows that each denial letter outlined the definition of "total disability" in line with the Plan and explained how the medical records did not meet this burden. Nor did MetLife shift its rationale for

denial during the appeals process.  Wang's initial claim and appeal attributed his symptoms to a cardiac condition, specifically his PVC diagnosis, and were primarily supported by records from cardiologists.  It was not until the second appeal that Wang identified mental-health conditions, such as a panic disorder, anxiety disorder, or depression, as a basis for his claim.  So it's hardly surprising that MetLife did not address those conditions before then, or that it would require some evidence that Wang was under treatment for such conditions.  And MetLife's assessment of his cardiac condition remained consistent throughout.

### D.

Wang maintains that MetLife's decision was tainted by various procedural defects, and that MetLife failed to conduct a "full and fair" review of the denial of benefits.  We disagree.

Under ERISA, a plan administrator "has the responsibility to fully investigate [a claimant's] claims before denying benefits."  *Capone*, 592 F.3d at 1199–1200; *see* 29 U.S.C. § 1104(a)(1)(A).  Then, if benefits are denied, ERISA requires a "full and fair review . . . of the decision denying the claim," "[i]n accordance with regulations of the Secretary."  29 U.S.C. § 1133(2).

Among other requirements, a full and fair review must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim."  29 C.F.R. § 2560.503–1(h)(2)(iv).  In the case of group health plans, the review also must "not afford deference to the initial adverse benefit

determination," and it must be made by an individual who is "neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." *Id.* § 2560.503-1(h)(3)(ii).

Wang claims that MetLife improperly limited its review to medical records dated after October 31, 2022, ignoring evidence of disabling conditions before that date. But Wang himself identified October 31, 2022, as the date his period of incapacity began. Wang also suggests that Sedgwick rushed to judgment based on an incomplete record, but he ignores substantial, uncontroverted evidence that multiple staff members reviewing Wang's claim requested additional information and Wang repeatedly asserted that what they had was enough. Nor does he indicate the relevance of any medical records that could have been obtained at that time.[3] Wang criticizes MetLife's failure to obtain a functional job profile, but the record reflects that MetLife determined that he did not have any functional limitations from his alleged disability, so the profile was not necessary, and Wang submitted a functional profile as part of his second appeal.

Wang also contends that the initial decision and the appeals process were tainted by a lack of impartiality and conflicts of interest. Since we exercise de novo review, however, we need not consider whether a conflict of interest affected Sedgwick's or MetLife's

---

[3] For instance, Wang offers no indication of any functional limitation imposed by his prostate-cancer diagnosis, or how that condition relates to the basis for his LTD claim.

25-11527                Opinion of the Court                19

decision-making, nor has Wang shown that it did.  *See Blankenship*, 644 F.3d at 1355.  Wang also has not shown that the supposed lack of independence in the second appeal demonstrates a lack of meaningful review.  It does not appear that the regulations require a second appeal to be handled by a different individual.  Rather, the regulations appear to mandate independence only between the initial "adverse benefit determination" and the subsequent appeal, which occurred here.  *See* 29 C.F.R. § 2560.503-1(h)(3)(ii).  In any case, as the district court pointed out, the second appeal denial letter was reviewed and signed by a higher-level employee who was not involved in Wang's first appeal.

E.

Finally, Wang asserts that MetLife engaged in misconduct during litigation that warrants sanctions and relief from the judgment.  Wang alleges various difficulties litigating the case as a *pro se* party, including a lack of assistance or clarity from the district court, issues related to service by mail, and confusing or misleading statements by counsel for MetLife.[4]

We ordinarily review decisions with respect to discovery matters and case management for abuse of discretion.  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366–67 (11th Cir. 1997).  "When employing an abuse of discretion standard, we must affirm

---

[4] Wang raises additional arguments for the first time in his reply brief, including that the district court failed to apply Federal Rules of Civil Procedure 6 and 16, but they are not properly before us.  *Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003).

unless we at least determine that the district court has made a clear error of judgment, or has applied an incorrect legal standard." *Moorer v. Demopolis Waterworks & Sewer Bd.*, 374 F.3d 994, 996–97 (11th Cir. 2004) (quotation marks omitted). And while we "give liberal construction to the pleadings of *pro se* litigants, we nevertheless have required them to conform to procedural rules." *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007).

Here, the district court did not abuse its discretion by refusing to impose sanctions or to grant other relief. As the court noted, active settlement negotiations did not postpone the deadline for dispositive motions, and Wang was aware of and had agreed to the deadline, so MetLife's conduct was not improper. And while Wang broadly alleges a lack of service by MetLife, the record reflects that, when Wang told MetLife that he did not receive certain filings, MetLife's counsel timely e-mailed him those filings. Moreover, despite Wang's *pro se* status, he was required to comply with procedural requirements, *Albra*, 490 F.3d at 829, and the district court could not "serve as *de facto* counsel." *Campbell*, 760 F.3d at 1168. Wang has not shown that the district court applied an incorrect legal standard, made a clear error of judgment, or otherwise abused its discretion in concluding that his allegations did not warrant sanctions or reopening of discovery.

## IV.

In sum, and for all the foregoing reasons, we affirm the judgment of the district court on Wang's complaint for wrongful denial of benefits under ERISA.

**AFFIRMED.**